832 A.2d 388

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Joseph CUEVAS, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 22, 2002.

Decided Sept. 24, 2003.

Wieslaw T. Niemoczynski, Stroudsburg, for Joseph Cuevas, Appellant.

Amy Zapp, Harrisburh, Mark Peter Pazuhanich, Stroudsburg, for the Com. of PA, Appellee.

Before: ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION

JUSTICE EAKIN.

Following a jury trial, appellant was convicted of first degree murder, third degree murder, tampering with or fabricating physical evidence, abuse of corpse, aggravated assault,

and criminal conspiracy.[1] On April 18, 2001, the jury determined the aggravating circumstances outweighed the mitigating circumstances and sentenced appellant to death. Appellant was also sentenced to one to two years imprisonment for abuse of corpse, a concurrent term of one month to two years for tampering, and one to two years for criminal conspiracy, to run consecutive to his death sentence. The third degree murder and aggravated assault convictions merged with first degree murder for sentencing. This direct appeal arises pursuant to 42 Pa.C.S. §§ 742, 9711(h)(1). We affirm the murder convictions, but must reverse the death sentence and remand for a new penalty hearing.

On the morning of November 13, 1999, while Tysheem Riddick slept on his couch, nursing a broken leg, appellant attacked him with his fists and a baseball bat. Soon after the attack began, Riddick's roommate, Corrado Decandido, came downstairs and witnessed appellant beating Riddick all over his body, particularly the head. Decandido testified appellant ordered him to help drag the battered but still alive Riddick to the basement. While there, appellant duct-taped Riddick's mouth, hands, and legs, secured a plastic trash bag over his head, and wrapped him in a comforter.

Decandido said he saw Riddick move and heard him making gurgling sounds from inside the comforter, which prompted appellant to kick Riddick a few times and say, "you deserve this, you f* * *ing n* * *r." N.T., 4/10/01, at 163. Decandido testified that during the final taping of Riddick in the basement, appellant confessed to killing 10 to 12 other people and told him, "[w]elcome to [my] world." *Id.*, at 161. The attack was in response to a prior argument between appellant and Riddick over a drug debt, which culminated in a shot fired at appellant months before the murder. Appellant frequently bought drugs from Riddick, who lived with Decandido and appellant's one-time girlfriend, Mercedes Green.

Immediately following the slaying, appellant quarantined the basement from the house's other residents, washed the

1. 18 Pa.C.S. §§ 2502(a), 2502(c), 4910, 5510, 2702, and 903, respectively.

walls and floors of Riddick's blood, and disposed of the stained couch. Appellant and Decandido then dumped Riddick's body near the Delaware River in Monroe County. Appellant confessed to Stacy Miller, telling her Riddick had struggled, but was hampered by the cast on his leg, and fell to the floor during the attack. Appellant told Miller he used his fists while Riddick was asleep, and then hit him in the back of the head with a baseball bat after Riddick fell to the floor. Miller testified appellant said Riddick was still moving and making sounds in the basement, but "he finished it." N.T., 4/10/01, at 21–22.

On November 15, 1999, appellant confessed to Green, telling her he had dumped Riddick's body in a creek, then threatened that if she did not stop running her mouth, she was "going to get lost, too." N.T., 4/09/01, at 171. Four days later, Green reported Riddick's disappearance to police, and authorized a search of the residence. On December 23, 1999, Riddick's body was found. An autopsy concluded the manner of death was homicide, and the cause of death was blunt force trauma with possible asphyxia.

Appellant was apprehended December 29, 1999, in Florida. The arresting officers testified that when summoned out of his hiding place, appellant responded, "[y]eah, I'm the one you're looking for. I'm the guy hiding in the closet.... Yeah, I beat the [man] who shot at me." N.T., 4/16/01, at 79–80.

Appellant filed pretrial motions, one attempting to preclude the Commonwealth from pursuing the death penalty, arguing there was no *prima facie* showing of aggravating circumstances, and another seeking to limit the prosecutor's references to the racial epithet he uttered during the crime; both were denied. The jury convicted him of first degree murder.

At the penalty phase, appellant moved for a mistrial, arguing the prosecutor's characterization of the appeal process and conditions of state prison life was an attempt to inflame the jury and deny him a fair trial; the motion was denied. The Commonwealth sought to prove two aggravating circumstances: appellant committed a killing by means of torture, 42

Pa.C.S. § 9711(d)(8); and at the time of the killing, the victim had been involved with appellant in the sale, manufacture, distribution, or delivery of a controlled substance, and the killing was related to such association, to promote appellant's activities in selling such substances. *Id.*, § 9711(d)(14).

Appellant sought to prove two mitigating circumstances: he had no significant prior criminal history (conceded by the prosecution), *id.*, § 9711(e)(1); and he was under the influence of extreme mental and emotional disturbances at the time of the killing. *Id.*, § 9711(e)(2). Specifically, appellant argued his three-day, crack cocaine binge should have mitigated his culpability to a penalty less than death. The jury found both aggravating circumstances proven, as well as both mitigating circumstances. The jury determined the aggravating circumstances outweighed the mitigating circumstances, and sentenced appellant to death.

On appeal, appellant raises the following issues: [2]

Trial:

1. Whether the standard of proof for a death penalty case should be proportionate to the irrevocability of the penalty.

2. Whether the trial court erred by denying appellant the opportunity to supplement evidence of his diminished capacity after a Commonwealth witness made it an issue.

3. Whether the prosecutor's use of racial epithet was calculated to inflame the passions of the jury.

Penalty Phase:

4. Whether the Commonwealth sustained its burden of proving any aggravating factors beyond a reasonable doubt.

5. Whether the trial court erred in not declaring a mistrial after the prosecution referred to the endless appeal process and living conditions of state inmates.

**2.** The issues framed by appellant have been re-ordered and clarified.

6. Whether appellant was entitled to adequate notice of the use and nature of victim impact testimony.

7. Whether the prosecution argued appellant's future dangerousness, warranting a *Simmons* instruction.

8. Whether the trial court should have instructed the jury pursuant to the Uniform Determination of Death Act, where torture is alleged by the prosecution as an aggravating circumstance.

9. Whether a penalty phase verdict slip must conform to the requirements of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

## *TRIAL*

Although appellant does not challenge the sufficiency of the evidence with regard to his first degree murder conviction, we are required to undertake an independent review of the sufficiency of the evidence in all capital cases. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 942 (1982). To determine whether the evidence was sufficient to sustain appellant's murder conviction, we accept the evidence in the light most favorable to the Commonwealth, and all reasonable inferences arising therefrom. *Commonwealth v. Nelson,* 514 Pa. 262, 523 A.2d 728, 732 (1987). To sustain a finding of first degree murder, the evidence must establish a human being was unlawfully killed, the accused did the killing, and the killing was done in a willful, deliberate, and premeditated way. 18 Pa.C.S. § 2502(a), (d); *Commonwealth v. Mitchell,* 528 Pa. 546, 599 A.2d 624, 626 (1991).

The evidence at trial indicates appellant beat Riddick while he lay on a couch sleeping, first with his fists, then with a baseball bat to the back of his head. Appellant bound and gagged Riddick, taping a plastic bag over his head to prevent breathing. This shows appellant possessed the specific intent to kill, and the killing was willful, deliberate, and premeditated; the evidence is sufficient to sustain the verdict.

Appellant argues that because the death penalty is irreversible, the guilt and penalty phases of capital cases

should carry a higher burden of proof than other criminal cases, such as "to the exclusion of all doubt" or "to the equivalent of a mathematical certainty." Appellant's Brief, at 27. Appellant characterizes this issue as one of first impression, but this Court, as well as the United States Supreme Court, has scrutinized Pennsylvania's death penalty procedures and held them constitutional. *See Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); *Commonwealth v. Means,* 565 Pa. 309, 773 A.2d 143, 151 (2001) (Opinion Announcing the Judgment of the Court) (citing conformity with *Blystone*); *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859, 878 (2000) ("Pennsylvania's death penalty statute has survived numerous constitutional challenges."); *Zettlemoyer, supra.* Clearly, Pennsylvania's capital cases receive the highest scrutiny and have more procedural safeguards than cases involving other crimes. (*e.g.,* separate penalty hearing weighing aggravating and mitigating circumstances, individual *voir dire,* direct appeal as of right to this Court). Appellant offers nothing new regarding this issue.

 Next, appellant argues he should have been permitted to present a diminished capacity defense, and that it was error for the court to deny an instruction on the involuntary intoxication defense. "Initially, we note that when asserting a diminished capacity defense to first degree murder, a defendant attempts to negate the element of specific intent to kill and, if successful, first degree murder is reduced to third degree murder." *Commonwealth v. McCullum,* 558 Pa. 590, 738 A.2d 1007, 1009 (1999). Diminished capacity is an extremely limited defense, which requires extensive psychiatric testimony establishing a defendant suffered from one or more mental disorders which prevented him from formulating the specific intent to kill. *Zettlemoyer,* at 943. Only where a defendant admits liability and contests the degree of guilt is a diminished capacity defense available. *Commonwealth v. Johnson,* 572 Pa. 283, 815 A.2d 563, 578 (2002).

It would have been error, as a matter of law, for the court to charge the jury on diminished capacity, because appellant testified he was innocent. *Id.,* at 578; *see Commonwealth v.*

*Hughes,* 480 Pa. 311, 389 A.2d 1081, 1084 (1978)(judge must not allow jury to consider insanity defense absent evidence presented at trial).

 Additionally, appellant only sought a diminished capacity defense near the close of the Commonwealth's case-in-chief, and then only in response to testimony describing the extent of appellant's drug use and paranoid symptoms. A defendant who intends to assert the defense of diminished capacity must notify the Commonwealth *before trial* and include documentation offering specificity regarding the nature and extent of the infirmity. Pa.R.Crim.P. 573(c)(1)(b). Appellant gave no prior indication of this defense, and never provided the Commonwealth with notice or details of any mental infirmity.

 This issue also fails because episodes of wild behavior and observations by lay witnesses of schizophrenic conduct following a killing do not support a diminished capacity instruction; they have *"absolutely no bearing* on whether at the time of the killing, appellant had the mental capacity to form the specific intent to kill. . . ." *Zettlemoyer,* at 944 (emphasis in original). At the time of the killing, appellant had the mental dexterity to secure the aid of an accomplice, tape the victim's arms, hands, legs, and face, dispose of the bloody couch, clean the floor and walls, quarantine the basement from other residents, and dispose of the body. In light of this evidence, the lack of expert testimony, the choice to present an innocence defense, and because appellant failed to notify the Commonwealth of his intent to argue diminished capacity, it was not error for the trial court to refuse to charge on such a defense. *Id.;* Pa.R.Crim.P. 573(c)(1)(b).

 Appellant's involuntary intoxication issue fails for the same reasons. It was only after Commonwealth witnesses described appellant's drug use, midway through trial, that he sought to offer the defense. Even assuming his intoxication was somehow involuntary, it clearly did not rob him of the ability to understand the desirability of immediately hiding his

crime and himself. Again, the lack of support for this claim is manifest.

Appellant next argues the prosecutor committed misconduct by his continued use of racial epithets, and vivid images of the attack and the murder scene's presumed "smell of death." Appellant asserts the prosecutor's repetition of the racial slur which he uttered as he beat Riddick was a calculated attempt to evoke jurors' passions and prejudices, inspiring them to render a verdict based upon emotion instead of evidence. A prosecutor is generally allowed to vigorously present and argue the case, as long as the comments are supported by evidence and contain inferences reasonably derived from that evidence. *Commonwealth v. Kemp*, 562 Pa. 154, 753 A.2d 1278, 1281 (2000). "The focus of this Court's consideration of claims regarding prosecutorial misconduct is to determine whether the defendant was deprived of a fair trial and not whether the defendant was deprived of a perfect trial." *Id.*, at 1282 (citing *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221, 231 (1995)); *see also Commonwealth v. Holloway*, 524 Pa. 342, 572 A.2d 687 (1990). Thus, "prosecutorial misconduct does not occur unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294, 316 (2002).

Here, the prosecution was required to prove appellant killed Riddick with malice. The prosecutor used the same offensive words appellant uttered to express his disdain for the victim during the beating. "[E]vidence concerning the relationship between the defendant and a homicide victim is relevant and admissible for the purpose of proving ill will, motive or malice." *Commonwealth v. Myers*, 530 Pa. 396, 609 A.2d 162, 164 (1992) (citing *Commonwealth v. Gibson*, 363 Pa.Super. 466, 526 A.2d 438, 440 (1987)). With the established latitude afforded a prosecutor to vigorously present his case and the need to prove beyond a reasonable doubt each ele-

ment of each crime, there was no misconduct here. The prosecutor was merely using appellant's exact words in the context and manner in which he conveyed them. Likewise, the prosecutor's imagery regarding the blows and odors from the crime scene stemmed from reasonable inferences based on the evidence presented. This was a violent crime; the image of that crime will necessarily be violent and disturbing as well.

## PENALTY PHASE

Appellant argues the Commonwealth failed to prove either of the aggravating circumstances beyond a reasonable doubt, as required by 42 Pa.C.S. § 9711(c)(1)(iii); therefore, he says, the jury should not have been permitted to consider them. To establish a murder was committed by means of torture, the Commonwealth must prove the defendant "intentionally inflicted on [the victim] a considerable amount of pain and suffering that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity." *Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1099 (1998); *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078, 1091 (1993); *Commonwealth v. Thomas*, 522 Pa. 256, 561 A.2d 699, 709 (1989). "The linchpin of the torture analysis is the requirement of an intent to cause pain and suffering *in addition to* the intent to kill." *Commonwealth v. Ockenhouse*, 562 Pa. 481, 756 A.2d 1130, 1136 (2000) (emphasis in original). That is to say, there must be an indication the defendant was not satisfied with the killing alone. *Commonwealth v. King*, 554 Pa. 331, 721 A.2d 763, 780 (1998).

"Oftentimes, it is especially difficult to determine whether a perpetrator committed the aggravating circumstance of torture, because in virtually all cases of murder, the perpetrator inflicts terrible pain and suffering on the victim, and by definition, the individual who inflicts this killing upon another does so with specific intent." *Ockenhouse*, at 1136. However, appellant's actions in this case mirror those in *King:* both killers hit the victim over the head with a blunt weapon; bound him with tape around the hands, arms, and legs; dragged him to the basement still alive; and wrapped a bag

around his head to prevent breathing. Appellant argues Riddick was unconscious after the blows to the head and did not experience any pain afterwards. However, Decandido testified he and appellant saw Riddick move and heard him making gurgling sounds after the attack, which belies his argument. As in *King*, this was a "particularly heinous manner in which to terrorize and murder, and the circumstances of the killing provided sufficient evidence from which the jurors could infer an intent on [perpetrator's] part to torture." *King*, at 780. The evidence sufficiently proves appellant tortured Riddick.

■ Appellant also argues the jury should not have been permitted to consider whether the killing was the product of drug activity because the Commonwealth offered no evidence Riddick's death would *promote* appellant's drug enterprise, as required by 42 Pa.C.S. § 9711(d)(14). This Court recently faced this issue, and held, "42 Pa.C.S. § 9711(d)(14), as framed by the legislature, requires the killing be with the purpose of promoting the defendant's drug activity, and [as here] the record on this element is insufficient." *Commonwealth v. Harvey*, 571 Pa. 533, 812 A.2d 1190, 1201 (2002) (Eakin, J., and Newman, J., concurring).

The Commonwealth suggests the statute requires only a showing of involvement, association, or competition, and does not require the killing be intended to promote appellant's drug activity. *Harvey*, decided after this trial, holds to the contrary; this section is not applicable just because the killing resulted from an argument over drugs. In this case, appellant was a buyer, not a seller, and although there was testimony he had an altercation relating to $20 he may have owed Riddick, there was no evidence appellant stood to benefit in future drug activity by killing the source of his drugs. Since the Commonwealth failed to prove an essential element of this aggravating circumstance, the jury should not have been permitted to consider it, and a new penalty hearing is warranted.[3]

---

**3.** Since we are reversing appellant's death sentence and remanding for a new penalty hearing, appellant's remaining issues are rendered moot and need not be addressed. *See Commonwealth v. Merchant*, 528 Pa.

Accordingly, appellant's first degree murder conviction is affirmed. The death sentence is vacated and this case is remanded for a new penalty hearing. Jurisdiction relinquished.

Former Chief Justice ZAPPALA did not participate in the decision of this case.

161, 595 A.2d 1135, 1139 (1991) (where resolution of first issue dispositive, no reason to address remaining issues).