J-A23033-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JIBRELL I. LEWIS | : | |
| | : | |
| Appellant | : | No. 3575 EDA 2015 |

Appeal from the Judgment of Sentence July 8, 2015
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0005100-2013,
CP-51-CR-0005101-2013, CP-51-CR-0005102-2013

BEFORE:   PANELLA, J., DUBOW, J., and FITZGERALD*, J.

MEMORANDUM BY FITZGERALD, J.:                **FILED DECEMBER 08, 2017**

Appellant, Jibrell I. Lewis, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas following his jury trial convictions of first-degree murder,[1] aggravated assault,[2] and two counts of firearms not to be carried without a license.[3]  Appellant argues the trial court erred in failing to suppress statements he made during his interrogation and for barring the defense expert from testifying to Appellant's diminished responsibility.  We affirm.

We adopt the facts and procedural history set forth by the trial court's

_____

[1] 18 Pa.C.S. § 2502(a).

[2] 18 Pa.C.S. § 2702(a).

[3] 18 Pa.C.S. § 6106(a).

_____

\*   Former Justice specially assigned to the Superior Court.

opinion.[4]  ***See*** Trial Ct. Op., 11/1/16, at 1-6.  In this timely appeal, Appellant raises the following issues for our review:

> Whether the trial court erred in failing to order evidence of statements made by [Appellant] in response to police interrogation suppressed and excluded from trial?
>
> Whether the trial court violated Pa.R.E. 702 by barring defense witness Dr. Clarence Watson, M.D., J.D. from presenting expert testimony in support of [Appellant's] defense of diminished responsibility and violated [Pa.R.E.] 703 by ruling that Dr. Watson could not mention statements made to the police or to him by [Appellant] in the context of testifying to the basis for his expert opinion in support of [Appellant's] defense of heat of passion and unreasonable self-defense unless [Appellant] testified at trial or unless the statements made to police were introduced into evidence by the Commonwealth?

Appellant's Brief at 2.

Appellant argues his statements made during his police interrogation should have been suppressed because he was not properly advised of his ***Miranda***[5] rights.[6]  Specifically, Appellant claims his statement was obtained during an unlawful two-step interrogation process, and that the

_____

[4] We note the trial court's opinion states Appellant's post-sentence motion was denied on November 13, 2015; however, the motion was actually denied by operation of law on November 16, 2015.

[5] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

[6] Although Appellant alleges the trial court erred in not suppressing his statement to the police, the Commonwealth did not introduce Appellant's statement at trial and Appellant did not testify.

Commonwealth failed to prove Appellant orally waived his **Miranda** rights.

Additionally, Appellant argues the trial court violated Rules 702 and 703 of the Pennsylvania Rules of Evidence, respectively, by preventing Appellant's defense expert from testifying in support of Appellant's claim of diminished responsibility, and by not allowing the defense expert to mention any of Appellant's statements to the expert that would support Appellant's claims of provocation or unreasonable self-defense.[7]  Appellant contends he did not contest shooting the victim and, therefore, his defense of diminished responsibility was permissible under Rule 702 to show the absence of malice and a specific intent to kill.  Moreover, Appellant asserts that Rule 703 permitted the defense expert to testify to statements Appellant made to the expert that indicated Appellant has an "unspecified depressive disorder with psychotic features" that would have prevented Appellant from formulating a specific intent to kill.  Appellant's Brief at 32.  Appellant concludes this Court should vacate his judgment of sentence and remand for a new trial.  We disagree.

After a thorough review of the record, the briefs of the parties, the

---

[7] We note the trial court did not bar the defense expert's opinion on provocation or unreasonable self-defense, but rather precluded his testimony regarding "self-serving" statements Appellant made to the expert that did not have a factual basis otherwise introduced into evidence.  Trial Ct. Op. at 17-18.  Nevertheless, the trial court instructed the jury on both voluntary manslaughter and unreasonable self-defense.  **See** N.T. Trial, 7/7/15, at 199-208.  Furthermore, Appellant did not testify at trial and defense counsel did not call the expert to testify on any basis.

applicable law, and the well-reasoned opinion of the Honorable Sandy L.V. Byrd, we conclude the trial court's opinion comprehensively discusses and properly disposes of the issues presented. *See* Trial Ct. Op. at 9-19 (finding the totality of the circumstances indicates Appellant's *Miranda* rights were not violated as he knowingly, intelligently, and voluntarily waived them, Appellant was not entitled to expert testimony on diminished capacity because he lacked a medical basis for the defense, and the defense expert could not testify to Appellant's statements to the expert because they were inadmissible hearsay and did not fall under any exception). Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/8/2017

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
### CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    :    CP-51-CR-0005100-2013
                                            :    CP-51-CR-0005101-2013
                                            :    CP-51-CR-0005102-2013
                                            :

v.                                             :    SUPERIOR COURT



CP-51-CR-0005100-2013 Comm. v. Lewis, Jibrell I.
Opinion

JIBRELL LEWIS                                         3575 EDA 2015

7520165531



**FILED**

NOV – 1 2016

Criminal Appeals Unit
First Judicial District of P

### OPINION

Byrd, J.                                                       November 1, 2016

On July 8, 2015 a jury convicted defendant Jibrell Lewis of first-degree murder, aggravated assault, and two counts of carrying a firearm without a license. Defendant was sentenced to life imprisonment without the possibility of parole for first-degree murder and an aggregate consecutive imprisonment term of seventeen (17) to thirty-four (34) years on the remaining charges. After defendant's post-sentence motion was denied on November 13, 2015, he filed a notice of appeal on November 25, 2015. On December 2, 2015 this court ordered defendant to file a statement of matters complained of on appeal. Defendant filed his statement on December 23, 2015.

### STATEMENT OF FACTS

On October 7, 2012, at or around 9:00 p.m., police officers responded to 711 North 3rd Street and found two gunshot victims inside. Stephanie Freeman was pronounced dead at the scene from a gunshot wound to her head. Dr. Edwin Lieberman, the Commonwealth's expert in forensic pathology, concluded to a reasonable degree of medical certainty that the cause of her

*Commw. v. Jibrell Lewis*                  Page 1 of 29

death was one gunshot wound to her head, and that the manner of death was homicide. The bullet entered the upper lid of her right eye, traveled through her brain, severing her brain stem, and exited the rear left of her head. Because the bullet severed her brain stem, her life functions ceased immediately. The presence of gunpowder stippling around her entrance wound and the absence of soot on her body or clothing indicated that the gun was fired about eight (8) to twelve (12) inches away from the front of Ms. Freeman's face. N.T. 07/01/15, pp. 93-96; N.T. 07/02/15, pp. 6-34, 67-68; N.T. 07/07/15, p. 14.

Her daughter, Chrissy Johnson,[1] was found suffering from a gunshot wound to the left side of the face, and was transported to Hahnemann Hospital for treatment. The bullet fractured Ms. Johnson's left cheekbone and jaw. Surgery was performed and a bullet fragment was removed from the joint of her jaw. Ms. Johnson survived her gunshot wound, but suffered nerve damage to the left side of her face. She was released from the hospital on October 12, 2012. N.T. 07/01/15, pp. 93-96; N.T. 07/02/15, pp. 67-68; N.T. 07/07/15, pp. 14, 26-27.

Police Officer Clyde Frasier, Crime Scene Unit, responded on October 7, 2012 at 11:55 p.m., and observed blood everywhere inside the residence. He also found condoms on the third floor. He recovered one projectile from the vestibule, and one .9mm fired cartridge casing from the second floor landing. He submitted this ballistics evidence to the Firearms Identification Unit. Officer Frasier also collected six (6) blood samples from the crime scene and submitted them to the criminalistics laboratory. The DNA from the samples matched those of Chrissy Johnson and Stephanie Freeman. N.T. 07/01/15, pp. 121-157; N.T. 07/07/15, p. 28.

Chrissy Johnson was interviewed by homicide detectives on October 11, 2012 and October 12, 2012. She gave two statements and provided a description of defendant as the man who shot

---

[1] Chrissy Johnson testified that although she was born male, she had undergone sexual reassignment surgery over a decade before this incident. N.T. 07/02/15, pp. 73-74.

her and her mother, and gave police his phone number. At trial, Ms. Johnson identified defendant as the man who came to her home on the night of the incident, October 7, 2012 around 8:00 p.m., and shot her and her mother. Defendant had first called her in response to an advertisement for an escort service that she placed on the internet. She spoke to defendant several times over the phone before ultimately inviting him to her home. When defendant arrived, they went upstairs, sat down and began a conversation. Shortly after his arrival at her home, Ms. Johnson performed oral sex on defendant. She testified that defendant asked for vaginal sexual intercourse, but she declined. Ms. Johnson testified that defendant was dissatisfied with her response and said something to the effect: "This is what I come all the way down here for?" Defendant then demanded money from her, at which point Ms. Johnson told him to leave and shouted for her mother, who was downstairs, to call the police. When she tried to escort defendant out of her home he pulled a gun from his jacket, and she ran into the bathroom. While Ms. Johnson was hiding in the bathroom, defendant fired a shot through the door and the bullet struck her in the face. After being shot, she exited the bathroom and told defendant she would give him money if he would leave. She and defendant went back upstairs, and she gave him approximately one thousand ($1000) dollars. After giving him the money, a struggle ensued when she tried, unsuccessfully, to grab the gun from his hand. Afterward, defendant, gun in hand, ran down the stairs where he encountered and killed Stephanie Freeman before exiting the home. N.T. 07/01/15, pp. 93-96; N.T. 07/02/15, pp. 46-143; N.T. 07/07/15, p. 14.

Ms. Johnson gave Detective Kevin Judge the cell phone number that defendant had given her earlier. After receiving this information, Detective Judge prepared a search warrant for that phone number. Defendant's cell phone records showed that he used his cell phone near Chrissy Johnson's home. Police also discovered that the cell phone was used numerous times on the 400

block of North 41st Street. As a result, police conducted surveillance of that area on October 12, 2012, starting around 11:15 a.m. N.T. 06/30/15, pp. 15-48; N.T. 07/02/15, pp. 145-160; N.T. 07/07/15, pp. 8-19.

At around 11:30 a.m., on October 12, 2015, Deputy Marshal Robert Clark, along with other law enforcement agents, observed defendant exit a residence at 403 North 41st Street. As he walked toward Deputy Marshall Clark's unmarked vehicle, defendant adjusted his waistband and revealed the butt of a firearm. Deputy Marshall Clark's observations resulted in a foot pursuit of defendant, before he was ultimately stopped and arrested. Recovered from defendant was a black semiautomatic handgun, and from inside a bag he was carrying the following items: a mask with two eye holes cut out, a small vial containing an unknown liquid, a soft body armor vest, and a laptop computer and other electronic items. N.T. 07/02/15, pp. 148-157.

After his arrest, defendant was taken to Penn Presbyterian Medical Center, where he received medical treatment. He was subsequently transported to the Homicide Unit and interviewed by Detective James Crone. In his interview, defendant stated he had never met Chrissy Johnson prior to the incident, but had found her number online, called her that day, and she invited him over to her home. Upon arriving at her home, she invited him inside and they went upstairs. He stated that Ms. Johnson began making sexual advances toward him, but when he tried to feel between her legs, she stopped him. According to defendant's statement, when he felt between her legs, he noticed that "something didn't feel right." He stated that Chrissy Johnson stood up and "all the female stuff went out the window, the way she was talking and standing and everything about her changed and I knew she was a man." The two then began yelling at one another, and a physical fight ensued. He stated that Ms. Johnson overpowered him, and he pulled out his gun in response. He further stated that she ran into the bathroom, but he thought she was going in there

to get a razor or a knife, so when she opened the door he shot her. Defendant stated that he went down the stairs to leave, but that Stephanie Freeman grabbed him and when he pushed her away the gun went off. However, the Commonwealth did not introduce his statement into evidence and defendant did not testify at trial.[2] Commw. Ex. 6.

Police Officer Jesus Cruz testified as an expert in firearms identification and comparison. He received the projectile and the fired cartridge casing recovered from the crime scene as well as the projectile retrieved from Chrissy Johnson's jaw. He also received the semi-automatic firearm that was recovered from defendant. After test-firing the semi-automatic firearm and comparing the test-fired bullets to the two submitted projectiles, Officer Cruz concluded to a reasonable degree of scientific certainty that they were both fired from that firearm. He was unable to determine if the fired cartridge casing recovered from the scene was fired from that firearm due to insufficient microscopic markings. Officer Cruz further opined that the gun would expel fired cartridge casings to the rear right and that they could travel about three (3) to five (5) feet away from the shooter. N.T. 07/01/15, pp. 121-157; N.T. 07/02/15, pp. 161-181.

Detective Valdez Trower from the SEPTA police force recovered video surveillance footage from the following Market-Frankford Line station stops for October 7, 2012 between the hours of 7:00 p.m. and 9:30 p.m.: the 40th Street stop, the Spring Garden Street stop at 500 North Broad Street, and the Girard Street stop at 1200 North Broad Street. He submitted the video surveillance footage to Detective Kevin Judge. The video surveillance footage showed defendant getting on a train at the 40th Street stop and getting off the train at the Spring Garden stop at about 8:30 p.m., which was a short distance from Chrissy Johnson's home. He was seen wearing a black leather jacket and a black and gray scarf. The video surveillance footage showed defendant

---

[2] Defendant litigated a pre-trial motion to suppress the statement. The motion to suppress was denied.

returning to the Spring Garden Street stop at about 9:15 p.m. At that time, he was wearing the black leather jacket but no scarf. On October 8, 2012, at 4:20 p.m., Officer Robert Flade recovered a black and gray scarf from the stairs leading to the second floor of 711 North 3rd Street. Defendant's DNA was found on that scarf. Detectives recovered the black leather jacket from defendant's residence. N.T. 07/02/15, pp. 181-183; N.T. 07/07/15, pp. 19-28.

The Commonwealth also introduced evidence establishing that defendant did not have a valid license to carry a firearm in October 2012. N.T. 07/07/15, pp. 29-30.

## STATEMENT OF ERRORS COMPLAINED OF ON APPEAL

Defendant raised the following issues in his Statement of Errors Complained of on Appeal, in accordance with Pennsylvania Rule of Appellate Procedure 1925(b):[3]

1. The trial court's findings – with regard to the two-step interrogation process to which Detective James Crone testified – that Detective Crone advised Defendant Jibrell Lewis of his *Miranda* rights before questioning the defendant pursuant to the first step of the two step interrogation, and that the defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights were clearly erroneous.

2. In violation of the defendant's rights against self-incrimination under the United States and Pennsylvania constitutions the trial court erred in failing to order evidence of both the oral statements allegedly made by the defendant to Detective Crone during the first step of the two step interrogation process, and oral and written statements allegedly made by the defendant during the second step of the two step interrogation process suppressed and excluded from trial for the following reasons:

a) the questioning of the defendant at the outset of the first step of the two step interrogation process was not preceded by adequate warnings pursuant to *Miranda v. Arizona*;

b) the defendant did not make a knowing, intelligent, and voluntary waiver of his *Miranda* rights prior to Detective

---

[3] The following is a verbatim account of defendant's statement.

Crone's questioning pursuant to the first step of the two step interrogation process;

    c)    even if interrogation of the defendant at the outset of the first step of the two step interrogation process was preceded by *Miranda* warnings, the oral statements made by the defendant were not voluntary;

    d)    the defendant's oral and written statements made during the second step of the two step interrogation process were the unlawful fruit of the unlawful interrogation of the defendant during the first step of the two step interrogation process in that – even assuming that the defendant was advised of his *Miranda* rights at the outset of the second step of the two step interrogation process – the interrogation during the second step of the two step process was effectively a continuation of the first step interrogation in terms of the completeness and detail of the questions and answers to the first step and second steps of questioning, the two statements' overlapping content, the continuous manner and setting of the first and second steps, the continuity of police personnel, the degree to which the interrogator's questions treated the second step as continuous with the first and the systematic and exhaustive manner of the total time period of the two step interrogation process;

    e)    statements made by the defendant during the second step interrogation of the two step interrogation process were not voluntary.

    3.    In violation of Defendant Jibrell Lewis's right to present a defense pursuant to his due process right to a fair trial under the United States and Pennsylvania constitutions, the trial court erred

    a)    by granting the Commonwealth's motion in limine to bar the testimony of defense expert Dr. Clarence Watson with respect to diminished capacity, and

    b)    by significantly limiting Dr. Watson's testimony as to heat of passion and mistaken self-defense.

    4.    In violation of Rule 703 of the Pennsylvania Rules of Evidence, the trial court erred by ruling that defense expert Dr. Clarence Watson could not mention, testify, or rely upon Mr. Lewis's statements to the police or to him in his psychiatric interview in explaining his expert opinion even though, pursuant to Rule 703 data and facts that are not ordinarily admissible but are

commonly considered by experts can be discussed by the expert as a basis for the expert's report and testimony.

5. In violation of Defendant Jibrell Lewis's right to confrontation pursuant under the United States and Pennsylvania constitutions, the trial court erred by denying the defense the opportunity to impeach by prior conviction the surviving complaining witness, Chrissy Johnson, the only Commonwealth eyewitness, with her 2005 conspiracy to commit theft of a prostitution customer. The court's error was especially egregious and prejudicial to the Defendant in view of the relevance of the *crimen falsi* nature of the prior conviction to the defense's factual assertions in the instant case.

6. In violation of Defendant Jibrell Lewis's right to present a defense pursuant to his due process right to a fair trial under the United States and Pennsylvania constitutions, the trial court erred by ruling that the defendant's 1996 robbery conviction, at age 16, could be used by the Commonwealth to impeach the defendant by prior conviction in the event the defendant took the stand and testified.

7. In violation of Defendant Jibrell Lewis's due process right to a fair trial under the United States and Pennsylvania constitutions, and specifically, in violation of Mr. Lewis's due process right to a jury instruction on Defendant's theory of defense, the trial court erred by refusing to give the jury a voluntary manslaughter jury instruction on the basis of heat of passion in the absence of cooling time.

8. In violation of Defendant Jibrell Lewis's due process right to a fair trial under the United States and Pennsylvania constitutions, and specifically, in violation of Mr. Lewis's due process right to a jury instruction on Defendant's theory of defense, the trial court erred by refusing to give the jury an involuntary manslaughter jury instruction on the basis of heat of passion in the absence of cooling time.

9. The trial court abused its discretion in denying Defendant's post sentence motion claim for relief that the verdict of guilty to the charge of first degree murder was against the weight of the evidence.

## DISCUSSION

Defendant first alleges that this court erred in denying his motion to suppress the statement he made to police. When reviewing a challenge to the suppression court's ruling, the appellate court is bound by the suppression court's findings of fact so long as they are supported by the record. *Commonwealth v. Chandler*, 505 Pa. 113, 477 A.2d 851 (1984). The appellate court will reverse this court's decision " 'only if there is an error in the legal conclusions drawn from those findings.' " *Commonwealth v. Basking*, 970 A.2d 1181, 1187 (Pa. Super. 2009) (quoting *Commonwealth v. Hill*, 874 A.2d 1214, 1216 (Pa. Super. 2005)). Thus, the appellate court must consider "whether the suppression court properly applied the law to the facts of the case." *Commonwealth v. Ruey*, 586 Pa. 230, 240, 892 A.2d 802, 807 (2006). In cases where the defendant's motion to suppress has been denied, the appellate court will " 'consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.' " *In re J.V.*, 762 A.2d 376, 379 (Pa. Super. 2000) (quoting *Commonwealth v. Reddix*, 513 A.2d 1041, 1042 (Pa. Super. 1986)). Our Superior Court has held that "it is the sole province of the suppression court to weigh the credibility of the witnesses. .... Further, the suppression court judge is entitled to believe all, part or none of the evidence presented." *Commonwealth v. Benton*, 655 A.2d 1030, 1032 (Pa. Super. 1995) (citation omitted). It is the Commonwealth's burden to prove by a preponderance of the evidence that the evidence challenged by a defendant in his motion to suppress is admissible. *See Basking.*

This court did not err in denying defendant's motion to suppress the statements made to Detective James Crone at the Homicide Unit. After defendant was taken into custody and treated at the hospital, he was transported to the Homicide Unit, where he met with Detective James Crone.

At the suppression hearing, Detective Crone stated that he observed that defendant, despite an initial affect, appeared normal and was not under the influence of drugs or alcohol. However, before a conversation ensued, Detective Crone orally warned defendant of his *Miranda* rights. Indeed, defendant was provided the warnings from Form 75-331D and Form 75-331E, later attached to his formal written statement.[4] Defendant knowingly, intelligently and voluntarily

---

[4] The following warnings are provided in 75-331D:

> We have a duty to explain to you and to warn you that you have the following legal rights
>
> A. You have a right to remain silent and do not have to say anything at all
>
> B. Anything you say can and will be used against you in Court
>
> C. You have a right to talk to a lawyer of your own choice before we ask you any questions and also to have a lawyer here with you while we ask questions
>
> D. If you cannot afford to hire a lawyer and you want one we will see that you have a lawyer provided to you free charge, before we ask you any questions
>
> E. If you are willing to give us a statement, you have a right to stop any time you wish

After Detective James Crone provided defendant with oral *Miranda* warnings from Form 75-331D, he asked defendant the questions provided in 75-331E, which are as follows:

> 1. Q. Do you understand that you have a right to keep quiet, and do not have to say anything at all?
>
> 2. Q. Do you understand that anything you say can and will be used against you?
>
> 3. Q. Do you want to remain silent?
>
> 4. Q. Do you understand that you have a right to talk with a lawyer before we ask you any questions?
>
> 5. Q. Do you understand that if you cannot afford to hire a lawyer, and you want one, we will not ask you any questions until a lawyer is appointed for you free of charge?
>
> 6. Q. Do you want to talk with a lawyer at this time, or to have a lawyer with you while we ask you questions?
>
> 7. Q. Are you willing to answer questions of your own free will, without force or fear, and without any threats or promises having been made to you?

waived his *Miranda* rights. Shortly thereafter, Detective Crone provided a set of written *Miranda* warnings, which defendant again waived knowingly, intelligently and voluntarily.[5] He then gave a formal written statement to Detective Crone, which was presented to defendant for his review and signature. After his review, defendant wrote an addendum at the bottom of page four (4) and then signed his statement.

---

[5] The following questions were asked by Detective Crone and answered by defendant:

1. Q. Do you understand that you have a right to keep quiet, and do not have to say anything at all?

   A. Yes.

2. Q. Do you understand that anything you say can and will be used against you?

   A. Yes.

3. Q. Do you want to remain silent?

   A. No.

4. Q. Do you understand that you have a right to talk with a lawyer before we ask you any questions?

   A. Yes.

5. Q. Do you understand that if you cannot afford to hire a lawyer, and you want one, we will not ask you any questions until a lawyer is appointed for you free of charge?

   A. Yes.

6. Q. Do you want to talk with a lawyer at this time, or to have a lawyer with you while we ask you questions?

   A. No.

7. Q. Are you willing to answer questions of your own free will, without force or fear, and without any threats or promises having been made to you?

   A. Yes.

Commw. Exh. 6, p. 2.

After considering the evidence and determining the credibility of witnesses presented at the suppression hearing, this court concluded that defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. This determination was made after considering the following two factors:

> First[,] the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.

*In re T.B.*, 11 A.3d 500, 505-506 (Pa. Super. 2010) (quoting *Commonwealth v. Cephas*, 522 A.2d 63, 65 (Pa. Super. 1987)). Those two requirements were met in this case. The credible evidence established that defendant was provided both oral and written *Miranda* warnings. Defendant twice waived his *Miranda* rights without coercion or duress and in accordance with the constitutional rights afforded to defendants in criminal cases. *See Commonwealth v. Elmobdy*, 823 A.2d 180, 183 (Pa. Super. 2003) (ruling that "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony"). Defendant was not intimidated, coerced, or deceived into making any of his statements. Rather, his decision was freely and deliberately made. He was not deprived of basic necessities such as food, water, or restroom breaks. When defendant made his choice, he was alert and fully aware of his surroundings. He was not under the influence of drugs or alcohol. Before defendant provided his statement, he was twice warned of his *Miranda* rights. Defendant understood the nature of his rights and the consequences of his decision to provide a statement to police. There is no support in the record for defendant's claim that his *Miranda* rights were violated. Based on the totality of

the circumstances, this court did not err in finding that he voluntarily, knowingly, and intelligently waived his *Miranda* rights.[6]

---

[6] At the suppression hearing, this court made the following findings of fact and conclusions of law:

> Both sides having rested on the motion to suppress, the Court will make findings of fact and conclusions of law. Herein, defendant seeks to suppress physical evidence and defendant's statements.
>
> One:   On October 7th, 2012, Chrissy Johnson was shot and injured and Stephanie Freeman was shot and killed inside 711 North 3rd Street in Philadelphia.
>
> Two:   The surviving victim, Ms. Johnson, was taken to Hahnemann Hospital for treatment where on 10/9/12 detectives attempted to interview her for a second time here at the hospital; and although intubated, she was able to provide a written description of the shooter, a man she had met at 13th and Market who later called her and came over to her home where the incident occurred.
>
> Three:   Based on that description and information obtained pursuant to a warrant regarding the phones used, coupled with video surveillance tapes from SEPTA, suspect was identified; to wit, this defendant.
>
> The suspect depicted in C-1 and C-2 is as aforementioned, the defendant in this case, Jibrell Lewis.
>
> As the investigation continued, again, utilizing the aforementioned phone records, cell towers and the like, one of the persons in the defendant's phone log identified Jibrell Lewis as the person depicted in C-1 and C-2.
>
> Six:   Thereafter, surveillance was set up in the area of 403 North 41st Street, defendant's home.
>
> Seven:   On that same day, 10/12/12, law enforcement agents, including Deputy US Marshals, observed defendant exit the aforementioned property carrying a bag while in the company of a female.
>
> Eight:   Defendant walked first in the direction of the agents and Deputy Clark observed him, Jibrell Lewis, adjust his waistband, at which time the agent observed the butt of a handgun.
>
> Nine:   Defendant was thereafter approached by various members of the US Marshals' office who called out: "Stop! Police!" to Mr. Lewis.
>
> Defendant, however, did not heed. Rather, he dropped his bag and fled with the officers in foot pursuit.
>
> 10:   Defendant was ultimately tased and a gun recovered in his immediate vicinity. Likewise, the bag, its content, were also recovered by authorities.
>
> 11:   As the foregoing makes clear, there was reasonable suspicion to stop the defendant based on his possession of a handgun, probable cause developed upon his abandonment of the property and subsequent flight.

Indeed, in light of the fact that the defendant fit the description of the shooter in this case and was identified from phone records as the person who had been in phone contact with Ms. Johnson, there was probable cause to arrest.

12: Thus, the aforementioned evidence, including the gun and the contents of the bag, was properly seized incident to a valid arrest or as abandoned property.

13: Once defendant was legally in custody, he was treated at Hahnemann Hospital and later transported to the homicide unit where he was interviewed by Detective Crone.

14: The detective observed that defendant, despite an initial affect, appeared normal and was not under the influence of drugs or alcohol. The detective gave the defendant oral MIRANDA warnings which were waived and a conversation ensued.

The detective stated that the oral warnings were the same ones utilized in the subsequent written statement; that is, they were taken from a form not unlike the 75-331D and 75-331-E.

Prior to taking the written statement, defendant was provided formal MIRANDA warnings which were committed to writing as was the subsequent formal statement which the defendant signed.

14: [sic] During the course of the oral and written interviews, the defendant was not coerced, abused or otherwise maltreated.

Indeed, the record reflects that water, food, cigarettes were given to the defendant and he was afforded the use of the toilet facilities.

15: Counsel's reliance on SEIBERT is misplaced.

By the language of that case, at 1024, Supreme Court 2601, Justice Souter makes the following remarks: "This case tests a police protocol for custodial interrogation that calls for giving no warnings to the rights and counsel until interrogation has produced a confession.

"Although such a statement is generally inadmissible, since taken in violation of MIRANDA, the interrogating officer follows it with MIRANDA warnings and then leads the suspect to cover the same ground a second time.

"The question here is the admissibility of the repeated statement. Because the midstream recitation of warnings after interrogation and unwarranted confession could not effectively comply with MIRANDA constitutional requirement, we hold that a statement repeated after a warning in such circumstances is inadmissible."

Clearly those are not the facts of this case.

Finally, this Court finds the defendant's statements were made knowingly, intelligently and voluntarily.

17: Accordingly, the motion to suppress physical evidence and the statements is denied.

N.T. 06/30/15, pp. 111-116.

Defendant also contends that this court erred in granting the Commonwealth's motion in limine to bar defense expert Dr. Clarence Watson's opinion testimony on diminished capacity. In *Commonwealth v. Miller*, 627 A.2d 741, 748-749 (Pa. Super. 1993), the court explained that "[t]he decision to admit or exclude expert testimony lies within the sound discretion of the trial court [and] the determination of the trial court will not be reversed unless an abuse of that discretion is found to exist." In ruling on the admissibility of such evidence, "the trial court must decide whether the evidence is relevant and, if so, whether its probative value outweighs its prejudicial effect." *Commonwealth v. Hawk*, 551 Pa. 71, 77, 709 A.2d 373, 376 (1998).

This court did not abuse its discretion in denying the admission of expert testimony on diminished capacity. Indeed, expert testimony "is admissible in all cases, civil and criminal alike, 'when it involves explanations and inferences not within the range of ordinary training knowledge, intelligence and experience.' " *Commonwealth v. Walker*, 625 Pa. 450, 486, 92 A.3d 766, 788 (2014) (quoting *Commonwealth v. Leslie*, 424 Pa. 331, 334, 227 A.2d 900, 903 (1967)). *See also* Pa. R. Evid. 702 (relating to testimony by expert witnesses). However, "[a]s with all expert opinion ... it is essential that the salient facts relied upon as the basis for the opinion be in the record." *Commonwealth v. Paskings*, 447 Pa. 350, 355-356, 290 A.2d 82, 85 (1972). Stated another way, "[a]n expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice." *Commonwealth v. Watson*, 945 A.2d 174, 176 (Pa. Super. 2008). *See also Commonwealth v. Blasioli*, 685 A.2d 151, 167 (Pa. Super. 1996) (ruling that "only expert testimony which assists the jury is admissible"). In *Commonwealth v. Laird*, 555 Pa. 629, 645, 726 A.2d 346, 353 (1999), the court explained that a diminished capacity defense "is only available to a defendant who admits criminal liability but contests the degree of guilt." A successful diminished capacity defense "negates the element of specific intent and, thus, mitigates

first-degree murder to third-degree murder." *Commonwealth v. Rosen*, 615 Pa. 305, 308, 42 A.3d 988, 990 n.1 (2012). Our Supreme Court has further noted that "[d]iminished capacity is an extremely limited defense, which requires extensive psychiatric testimony establishing a defendant suffered from one or more mental disorders which prevented him from formulating the specific intent to kill." *Commonwealth v. Cuevas*, 574 Pa. 409, 418, 832 A.2d 388, 393 (2003).

There was nothing in the expert report by Dr. Watson on the ultimate issue of whether or not defendant had a mental disorder or defect that directly affected his ability to formulate the specific intent to kill. At defense counsel's request, Dr. Clarence Watson conducted a psychiatric examination of defendant on February 26, 2015. In Dr. Watson's April 24, 2015 report, he opined that defendant suffers from an unspecified depressive disorder with psychotic features, coupled with alcohol and substance abuse disorders. Dr. Watson's diagnosis was based on defendant's "longstanding symptoms and medical records indicating a history of episodic depressive symptoms, episodic experiences of auditory hallucinations, and ongoing abuse of various substances." Dr. Clarence Watson's April 24, 2015 Psychiatric Evaluation Report p. 14. Dr. Watson explained that defendant's "description of his interaction with others reflects a heightened preoccupation with protecting himself and avoiding situations in which he could be victimized." *Id.* Dr. Watson stated that this incident caused defendant to feel "overwhelmed with desperation to escape and interfer[ed] with his ability to think." *Id.* at p. 15. However, nowhere in Dr. Watson's report did he diagnose defendant with any cognitive brain disorder that limited his ability to formulate the specific intent to kill.

This case is analogous to *Commonwealth v. McCullum*, 558 Pa. 590, 596, 738 A.2d 1007, 1010 (1999), where our Supreme Court held that a diminished capacity defense was not established because the expert "made no mention of [the defendant's] cognitive functions of deliberation and

premeditation at the time of the murder or of his ability – or inability – to formulate the specific intent to kill." Similarly, as aforementioned, the psychiatric expert in this case did not provide an opinion on this salient issue. *See also Commonwealth v. Taylor*, 583 Pa. 170, 188, 876 A.2d 916, 927 (2005) (holding that "[t]he fact that [the defendant's] defense expert testified that [the defendant] was psychotic and suffered from varying degrees of mental illness does not ineluctably suggest that he lacked the *capacity* to form a specific intent to kill"); *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 30, 454 A.2d 937, 944 (1982), *abrogated on other grounds by Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003) (rejecting conclusion that "a diagnosis of 'schizoid personality with paranoid features' is relevant to the issue of a defendant's mental capacity to form the specific intent to kill"). Because Dr. Watson's report gave no medical basis for a diminished capacity defense, his proffered expert testimony on that issue was inadmissible and it would have only confused the jury. *See Commonwealth v. Watson*, 945 A.2d 174, 176 (Pa. Super. 2008) (ruling that "[a]n expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice"); *Commonwealth v. Rounds*, 518 Pa. 204, 209, 542 A.2d 997, 999 (1988) (noting that "[w]ithout the facts, a jury cannot make any determination as to validity of the expert's opinion"); *Commonwealth v. Funke*, 452 A.2d 857, 862 (Pa. Super. 1982) (quoting *Commonwealth v. Zeger*, 186 A.2d 922, 925 (Pa. Super. 1962), which informed that "[o]ne of the duties of a trial judge is 'to clarify the issues so that the jury may comprehend the questions they are to decide' "). Thus, defendant was not entitled to expert testimony on diminished capacity because there was no medical basis for this defense.

Defendant also contends that this court erred in a pretrial ruling by limiting Dr. Watson's proposed expert opinion testimony regarding heat of passion voluntary manslaughter and unreasonable belief voluntary manslaughter. Contrary to defendant's argument, this court did not

limit Dr. Watson's proposed expert opinion testimony on these defenses. This court ruled that defendant was permitted to introduce Dr. Watson's expert opinion on heat of passion voluntary manslaughter and unreasonable belief voluntary manslaughter. However, Dr. Watson would be precluded from testifying about self-serving statements that defendant made to him during his psychiatric interview or the hearsay statements he made to police unless a factual basis for said statements was introduced in evidence. However, defendant did not testify and the Commonwealth did not introduce defendant's statement. Thus, there was no factual basis for the expert opinion.

As mentioned above, this court did not err in precluding Dr. Watson from testifying about the statements defendant made to him during the psychiatric interview or the statements defendant made to police. In *Commonwealth v. Miller*, 627 A.2d 741, 748-749 (Pa. Super. 1993), the court explained that "[t]he decision to admit or exclude expert testimony lies within the sound discretion of the trial court [and] the determination of the trial court will not be reversed unless an abuse of that discretion is found to exist." In ruling on the admissibility of such evidence, "the trial court must decide whether the evidence is relevant and, if so, whether its probative value outweighs its prejudicial effect." *Commonwealth v. Hawk*, 551 Pa. 71, 77, 709 A.2d 373, 376 (1998). An evidentiary ruling "will not be disturbed 'unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous.' " *Commonwealth v. Bozyk*, 987 A.2d 753, 756 (Pa. Super. 2009) (quoting *Commonwealth v. Einhorn*, 911 A.2d 960, 972 (Pa. Super. 2006)).

There was no error in ruling that Dr. Watson could not testify to defendant's statements because they were inadmissible hearsay that did not fall under any exception to the hearsay rule. *See* Pa. R. Evid. 802 (stating that "[h]earsay is not admissible except as provided by these rules,

by other rules prescribed by the Pennsylvania Supreme Court, or by statute"). Certainly, an expert "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed ... [i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject[.]" Pa. R. Evid. 703. In an attempt to establish his claim that he committed heat of passion voluntary manslaughter or unreasonable belief voluntary manslaughter, rather than first-degree murder, defendant sought to introduce expert testimony that would have included his statements discussing his hearsay version of how the incident occurred. As the court held in *Commonwealth v. Towles*, 630 Pa. 183, 208, 106 A.3d 591, 606 (2014), "[t]here is a distinction between an expert using basic facts provided by laymen to form an expert opinion, versus one who simply parrots out-of-court statements in court, thereby acting as a conduit for hearsay." Furthermore, "Pennsylvania's Rules of Evidence do not provide a mechanism for a criminal defendant to decline to testify and to avoid the rules of evidence by using an expert witness to introduce his story into the record." *Id.* Consequently, this court did not err in ruling that the defense expert could not "simply regurgitate what defendant told him" because "[d]efendant's version must come from the defendant on the witness stand and subject him to cross-examination." N.T. 07/01/15, pp. 11-15. *See also Commonwealth v. Miller*, 605 Pa. 1, 21, 987 A.2d 638, 650 (2009) (holding that trial counsel was not ineffective for being unable to elicit expert testimony regarding heat of passion because defendant refused to testify, thereby making it "virtually impossible for counsel to convince the trial court" of his defense). Thus, defendant's claim has no merit.

Defendant next alleges that his right to confrontation was violated when this court denied his request to introduce a prior conviction of Chrissy Johnson. It must first be noted that defendant did not file a pre-trial motion seeking the admission of this evidence under Pennsylvania Rule of

Evidence 404. Nonetheless, before trial commenced, this court was informed that Chrissy Johnson was arrested in 2004 and convicted in May 2005 on charges of possession of an instrument of crime, simple assault, and conspiracy.

This court properly denied the admission of this prior conviction because defendant failed to establish that they were crimen falsi offenses. Pennsylvania Rule of Evidence 609(a) provides that: "[f]or the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or nolo contendere, must be admitted if it involved dishonesty or false statement." Defendant did not present any evidence proving that Chrissy Johnson's conviction of possession of an instrument of crime, simple assault, and conspiracy involved dishonesty or false statement. Thus, there was no error in determining that these convictions were not crimen falsi.

Additionally, the prior conviction did not fall within the ten (10) year time period proscribed by Rule 609. According to defense counsel, Chrissy Johnson was convicted on May 5, 2005, which was approximately ten (10) years and two (2) months from July 1, 2015, the date defendant's trial commenced. Defense counsel conceded that Chrissy Johnson's convictions were not within the ten (10) year time period. *See* N.T. 07/01/15, pp. 21-22. Pennsylvania Rule of Evidence 609(b) states that if more than ten (10) years have passed, "[e]vidence of the conviction is admissible only if: (1) its probative value substantially outweighs its prejudicial effect; and (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." In determining that the probative value of this evidence did not substantially outweigh its prejudicial effect, this court considered its ruling that defendant would not be prohibited from impeaching Chrissy Johnson on a crimen falsi conviction

that fell within the ten (10) year time period.[7] The record shows that both the prosecutor and defense counsel had the opportunity to question Chrissy Johnson about her prior federal conviction for passport fraud under a different name. *See* N.T. 07/01/15, pp. 17-28; N.T. 07/02/15, pp. 75-76; 102-103.[8] Thus, defendant suffered no prejudice from this court's ruling because he was

---

[7] This court made the following ruling:

> The issue of a 2004 arrest, that is, one that resulted in conviction for possession of an instrument of crime, simple assault and criminal conspiracy is one to which I have given due consideration.
>
> There has been no Rule 404(b) motion filed. The look-back period has expired. It's more than ten years-old. I am called upon to balance the probative value of that conviction against its prejudicial effect.
>
> I am assisted in that regard with the knowledge that the complainant in this case has a second conviction for crimen falsi which falls within the ten year period that we have been discussing. I rule that you may use the second conviction. You may not use the first conviction for any purpose.

N.T. 07/01/15, p. 27.

[8] When the Commonwealth conducted direct examination of Chrissy Johnson, the following exchange occurred:

[Assistant District Attorney]: You told us that you were born as Christopher Johnson, but since that time you used a number of names, haven't you?

[Chrissy Johnson]: Yes.

[Assistant District Attorney]: You used Gerald McDonald.

[Chrissy Johnson]: Yes.

[Assistant District Attorney]: That's the name that we will talk about later — that's the name you were convicted Federally of fraud, correct?

[Chrissy Johnson]: Yes.

[Assistant District Attorney]: You also used the name of Christopher McDonald, correct?

[Chrissy Johnson]: I believe so.

[Assistant District Attorney]: You used the name Wayne McDonald, correct?

[Chrissy Johnson]: I think so.

[Assistant District Attorney]: You used the name Jacqueline Williams, correct?

[Chrissy Johnson]: Yes.

[Assistant District Attorney]: You used all those names, essentially aliases, correct?

[Chrissy Johnson]: I was going through a transition.

[Assistant District Attorney]: They're different names in which you used to hide your identity to law enforcement, correct?

afforded the opportunity to attack Chrissy Johnson's credibility. Accordingly, defendant's claim is without merit.

Defendant further contends that this court erred in permitting the Commonwealth the opportunity to impeach him with his 1996 conviction for robbery if he testified at trial. To the contrary, this court did not err in permitting the introduction of this evidence. Pursuant to Rule of Evidence 609(b), impeachment by evidence of a criminal conviction is admissible if it is within ten years of the "witness's conviction or release from confinement for it, whichever is later." Defendant was sentenced for his robbery conviction on March 2, 1999, at CP-51-CR-0100811-1997. His sentence was completed in 2009, thereby making it a prior conviction that was about six (6) years removed from the commencement of defendant's trial in 2015. *See* N.T. 06/30/15, pp. 116-117; N.T. 07/01/15, pp. 24-28. Consequently, his robbery conviction was within the ten

---

| [Chrissy Johnson]: course I will hide my identity. | Yes. I fled my country from persecution. Of |
|---|---|

N.T. 07/02/15, pp. 75-76. Defense counsel further addressed Chrissy Johnson's prior conviction during cross-examination of her testimony:

| [Defense Counsel]: attorney did, as well, but you were 2005? | I already mentioned it, I think the district convicted of fraud in Federal Court, correct, |
|---|---|
| [Chrissy Johnson]: | Yes. |
| [Defense Counsel]: Gerald McDonald, correct? | You were convicted under the name of |
| [Chrissy Johnson]: | I believe so. |
| [Defense Counsel]: describe you as a black male, correct? | All of the records of that Federal conviction |
| [Chrissy Johnson]: country in fear of my life. I obtained an identity. I went oversees [sic] and had my sex change in surgery. In detail, that's what it's about. | It's a passport, it's an identity. I fled my |
| [Defense counsel]: correct? | You committed a crime of dishonesty, |
| [Chrissy Johnson]: | Correct. |

N.T. 07/02/15, pp. 102-103.

(10) year time limit. Although this was a juvenile adjudication, this evidence was admissible for impeachment purposes. *See* Pa. R. Evid. 609(a), (d); 42 Pa. C.S. §6354(b). Even if this evidence is considered to be more than ten (10) years old, the probative value of this evidence substantially outweighed any prejudicial effect. Had defendant testified at trial, he would have been subjected to impeachment like any other witness. *See Commonwealth v. Dobrolenski*, 460 Pa. 630, 640, 334 A.2d 268, 273 (1975) (avowing United States Supreme Court's ruling in *Brown v. United States*, 356 U.S. 148, 154-155 (1958), that if a defendant "takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness"). However, defendant decided to not testify at trial. Consequently, his prior conviction was not admitted into evidence. Accordingly, defendant cannot establish prejudice. Thus, this claim is meritless.

Defendant also contests this court's denial of his request to instruct the jury on voluntary manslaughter. In reviewing a trial court's refusal to provide a jury instruction, the appellate court reviews whether the jury instruction is warranted by the evidence presented in the case. *Commonwealth v. Baker*, 963 A.2d 495 (Pa. Super. 2008). The Superior Court has further explained that "[i]n examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case." *Commonwealth v. Nyankun A. Thomas*, 904 A.2d 964, 970 (Pa. Super. 2006).

In *Commonwealth v. Kim*, 888 A.2d 847 (Pa. Super. 2005), the court held that "a homicide defendant is entitled to a jury instruction on voluntary manslaughter only 'where the offense has been made an issue in the case and where the evidence would reasonably support such a verdict.' " *Id.* at 852 (quoting *Commonwealth v. Frederick Thomas*, 552 Pa. 621, 640, 717 A.2d 468, 478

(1998)). The crime of voluntary manslaughter "involves a killing in a sudden and intense passion resulting from a serious provocation or an unreasonable belief in self-defense." *Commonwealth v. Cox*, 546 Pa. 515, 539, 686 A.2d 1279, 1291 (1996). Voluntary manslaughter "is an appropriate verdict for 'heat of passion' killings, where, 'at the time of the killing, [the defendant] acted under sudden and intense passion [due to] serious provocation by the victim.' " *Kim*, 888 A.2d at 853 (quoting *Frederick Thomas*, 552 Pa. at 640, 717 A.2d at 477). Specifically, "heat of passion" includes "emotions such as anger, rage, sudden resentment or terror, which renders the mind incapable of reason." *Commonwealth v. Speight*, 544 Pa. 451, 467, 677 A.2d 317, 324-325 (1996), *abrogated on other grounds by Freeman*. In *Commonwealth v. Copeland*, 554 A.2d 54, 57 (Pa. Super. 1988), the court explained that "[t]he passion which will reduce an unlawful killing to voluntary manslaughter must be caused by legally adequate provocation." The law "is quite explicit that the determination of whether a certain quantum of provocation is sufficient to support the defense of voluntary manslaughter is purely an objective standard." *Commonwealth v. McCusker*, 448 Pa. 382, 389, 292 A.2d 286, 289 (1972). In determining whether there was serious provocation, one must consider " 'whether a reasonable [person] confronted by the same series of events, would become impassioned to the extent that his mind would be incapable of cool reflection.' " *Kim*, 888 A.2d at 853 (quoting *Commonwealth v. Galloway*, 485 A.2d 776, 783 (Pa. Super. 1984)).

This court did not abuse its discretion in denying defendant's request because there was no evidence to reasonably support a voluntary manslaughter verdict. *See Commonwealth v. Bohonyi*, 900 A.2d 877, 883 (Pa. Super. 2006) (quoting *Commonwealth v. Buksa*, 655 A.2d 576, 583 (Pa. Super. 1995), which held that the trial court has no obligation "to instruct a jury upon legal principles which have no applicability to the presented facts").

The evidence presented at trial did not establish that defendant acted under a sudden and intense passion due to serious provocation by the victim. Defendant answered Chrissy Johnson's advertisement offering escort service on her internet webpage, and arranged to meet her. When he arrived at her home, she performed oral sex on him. Defendant expressed interest in having vaginal sexual intercourse with her, but she declined. After she denied his request, he demanded money, and pulled out his gun when Ms. Johnson asked him to leave. He then shot her in the face before shooting her mother, Stephanie Freeman, in the head.

There is no support for the argument that defendant was seriously provoked by the victim. In *Commonwealth v. Busanet*, 618 Pa. 1, 34, 54 A.3d 35, 55 (2012), the court explained that "both passion and provocation must be established" before a killing is considered voluntary manslaughter. Defendant may well have been upset that Chrissy Johnson rejected his demand for vaginal sexual intercourse. He may have also felt betrayed by Chrissy Johnson's alleged deceit regarding her gender identity. However, there is no basis for concluding that such minor indignities rose to the level of provocation necessary to require a jury instruction on voluntary manslaughter. *See, e.g., Commonwealth v. Martin*, 607 Pa. 165, 5 A.3d 177 (2010) (concluding that the decedent's sexual advances toward the defendant may have triggered the defendant's post-traumatic flashback of childhood sexual abuse, but it did not render defendant incapable of cool reflection); *Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277 (2011) (holding that the defendant was not sufficiently provoked into heat of passion by argument with victim occurring shortly before murder or by other serious issues in relationship); *Commonwealth v. Sanchez*, 623 Pa. 253, 315, 82 A.3d 943, 980 (2013), *cert. denied*, 135 S.Ct. 154 (2014) (concluding that the defendant was not seriously provoked when there was no gun in the decedent's possession and when the defendant "could have simply retreated" from the situation). Instead of leaving the

premises like a reasonable person would have done in this situation, defendant resorted to violence. He shot Chrissy Johnson in her face, causing permanent injury. He also shot Stephanie Freeman in her head, killing her. Clearly, the evidence does not establish that a reasonable person confronted with these circumstances would have become so impassioned that he would have been incapable of cool reflection.

Rather, the evidence clearly showed that defendant committed first-degree murder, instead of voluntary manslaughter, as he possessed malice and the specific intent to kill the decedent. *See Commonwealth v. Butler*, 446 Pa. 374, 378, 288 A.2d 800, 802 (1972) (reiterating that "it has long been the law that the use of a deadly instrument on a vital part of the body is sufficient to establish the specific intent to kill"); *Commonwealth v. Davis*, 479 A.2d 1077, 1080 (Pa. Super. 1984) (ruling that "[a]n intent to kill can be formed in a fraction of a second" because "[a]ll that is required is a conscious, fully formed intent to bring about the death of another"). *See also Commonwealth v. Pirela*, 510 Pa. 43, 51, 507 A.2d 23, 27 (1986) (quoting *Commonwealth v. Berry*, 461 Pa. 233, 237, 336 A.2d 262, 264 (1975), which noted that voluntary manslaughter " 'is a concession to the infirmity of human nature, not an excuse for undue or abnormal irascibility' "). In light of these facts, a voluntary manslaughter jury instruction was not warranted. *See Speight* (holding that trial court did not err in denying request for voluntary manslaughter heat of passion instruction because there was no evidence that the defendant acted under heat of passion or that killing resulted from serious provocation by the victim); *Commonwealth v. Arrington*, 624 Pa. 506, 86 A.3d 831 (Pa. 2014)(upholding trial court's denial of voluntary manslaughter heat of passion instruction because evidence provided that the defendant intentionally killed victim by shooting her in a vital area of the body).

Defendant's next claim is that this court erred in denying his request for a jury instruction on involuntary manslaughter. In *Commonwealth v. Chambers*, 546 Pa. 370, 382, 685 A.2d 96, 102 (1996), the court held that "[t]he trial court has broad discretion in phrasing jury instructions, and may choose its own wording[.]" The Superior Court has also explained that "[i]n examining the propriety of the instructions a trial court presents to a jury, [its] scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case." *Nyankun A. Thomas*, 904 A.2d at 970. Additionally, an appellate court will not find error "where the court fails to use the specific language requested by the accused, but rather only where the applicable law is not adequately, accurately and clearly communicated to the jury." *Commonwealth v. Leber*, 802 A.2d 648, 651 (Pa. Super. 2002). In reviewing a trial court's refusal to provide a jury instruction, the appellate court reviews whether the jury instruction is warranted by the evidence presented in the case. *Commonwealth v. Baker*, 963 A.2d 495 (Pa. Super. 2008). Indeed, a trial court has no obligation "to instruct a jury upon legal principles which have no applicability to the presented facts." *Commonwealth v. Bohonyi*, 900 A.2d 877, 883 (Pa. Super. 2006) (quoting *Commonwealth v. Buksa*, 655 A.2d 576, 583 (Pa. Super. 1995)).

In *Commonwealth v. Fletcher*, 604 Pa. 493, 544, 986 A.2d 759, 791 (2009), the court held that "[i]nvoluntary manslaughter is defined as a killing that occurs when, 'as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, [the defendant] causes the death of another person.' .... An instruction on involuntary manslaughter is not required unless it has been made an issue in the case and the facts would support such a verdict." *Id.* (citing 18 Pa. C.S. §2504(a)). *See also Commonwealth v. Soltis*, 687 A.2d 1139, 1141 (Pa. Super. 1996) (holding that "[a]bsent some evidence in the record showing that the [victim's] death was an accident caused by [the defendant's] extreme carelessness, [the defendant] is not entitled to an involuntary

manslaughter instruction"). In this case, there was no credible evidence to support the conclusion that the killing was accidental or that it resulted from defendant acting in a reckless or grossly negligent manner. Instead, as evidenced by the jury's verdict, defendant possessed the specific intent to kill Stephanie Freeman, which warranted his first-degree murder conviction. Because the evidence did not support an involuntary manslaughter verdict, this court did not err in denying defendant's request for an instruction on this offense. Thus, defendant's claim is meritless.

Defendant's final allegation is that this court erred in denying his post-sentence motion. Specifically, defendant claims that this court erred in denying his request for relief on the basis that the guilty verdict to the charge of first-degree murder was against the weight of the evidence. A new trial will be granted on this basis " 'only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice.' " *Commonwealth v. VanDivner*, 599 Pa. 617, 630, 962 A.2d 1170, 1177 (2009) (quoting *Commonwealth v. Cousar*, 593 Pa. 204, 222, 928 A.2d 1025, 1036 (2007)). In reviewing whether the verdict was against the weight of the evidence, the trial court must exercise its discretion in determining whether " 'certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.' " *Commonwealth v. Widmer*, 560 Pa. 308, 320, 744 A.2d 745, 752 (2000) (quoting *Thompson v. Philadelphia*, 507 Pa. 592, 601, 493 A.2d 669, 674 (1985)). The appellate court's review "is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." *Commonwealth v. Diggs*, 597 Pa. 28, 39, 949 A.2d 873, 879 (2008). In this case, defendant has not highlighted any evidence that should have been given greater, lesser, or equal weight than the evidence that was introduced at trial. Moreover, the jury reached its verdict after duly considering all relevant and properly admitted evidence. Consequently, defendant's claim that the verdict was

against the weight of the evidence has no merit. Thus, this court did not abuse its discretion in denying defendant's post-sentence motion.

Accordingly, in light of the foregoing, the judgment of sentence should be AFFIRMED.

BY THE COURT,

Sandy L.V. Byrd,    J.